May it please the Court, I'm Matt Staver. I'd like to reserve approximately five minutes for rebuttal. You have a clock in front of you, and when it ticks down, your time will be up. Okay, thank you. On behalf of the appellants, we respectfully request that this Court grant the injunction and reverse the lower court, because SB 1172 is viewpoint and content-based, and it's vague and overbroad. We're here on a preliminary injunction. I'll primarily focus on the issue of the substantial likelihood of success on the merits or the issues that raise serious issues going to the merits. SB 1172 prohibits counselors from providing and clients from receiving any counsel under any circumstances that seeks to change sexual orientation, which includes same-sex sexual attractions, behavior, or identity. These same counselors may offer and clients, minors, might receive counsel that affirms same, but under no circumstances may they offer or seek counsel that seeks change. Even as to minors. Excuse me. As to minors. As to minors, that's correct. Adults can get this counseling if they wish. There's no prohibition against that. No, there's not. As far as as soon as you turn 18, there's no prohibition to that. And you agree that the State has greater powers in protecting minors than it does in protecting adults. Certainly. Although there are substantial powers that the State has in protecting adults. But as to minors, the State, for example, can force parents to accept medical treatment for minors if, you know, emergency epidectomies, even though the parents might have a religion that prohibits surgery, right? Correct. Or transfusions of blood. Yes, Your Honor. But in those cases, there is real and direct and immediate harm to the minor. And here, there's no evidence of that. In fact, the statute itself on its face cites the APA Task Force of 2009. And that APA Task Force says that there's no research with regards to harm relevant to minors seeking change counsel. None at all. Counsel, what level of deference should we give to the legislative findings that found harm, risk of harm to minors? I think only – I think that it's content and viewpoint based, and so in that respect, I don't think we give them very much deference. But even if you were giving rational basis deference, the fact of the matter is what they're doing is irrational. It's unreasonable, because there's no evidence in this record. In fact, there's evidence to the contrary that there's harm to minors. There's absolutely no research at all. So let's back up, because my question is a little bit different. I don't think you and I are having trouble communicating about the fact that the legislature made findings that this sexual orientation change effort therapy risks harm to minors. Do we agree on that? That's correct. Okay. So then my question really is, given that we have those legislative findings, what level of deference should we give to them? Well, I think you give them deference to that, but I think you have to do an independent review of those particular findings to find out if they're just merely conjectural or hypothetical. Okay. So your point is that you think the evidence that was before the legislature is not adequate support for their findings. That's correct. In fact, the evidence that the legislature cites doesn't support their findings. The actual evidence that they rely upon says that there's no research with regards to harm regarding minors, and it relates to adults. There's evidence of benefit that actually happens. And here, what they're doing is the same. What difference does it make whether there are or are not legislative findings? Isn't the same presumption of constitutionality of a statute in play whether or not there are explicit findings? I would say that that's true. But I think that this Court needs to independently evaluate. So let me just follow that by saying, so let's assume that the findings were completely unconnected to the statute. We find that it's Tuesday. We find that this room is the correct temperature for everyone to be comfortable, and we hereby pass the statute. I'm not really sure what role you're asking us to give to the findings, whether they're correct or supported or incorrect or unsupported. I think as it relates to the findings, this is a pure question of law, and it's not a factual determination whether they have these findings in here or don't have the findings in here. I think the issue is, does this raise serious First Amendment issues going to the merits? And I think it does. The issue is that's my other question, I guess, for you, which is there is some precedent in this Court that therapy, talk therapy, is a form of medical treatment that is not subject to the usual amount of legislative oversight. Why shouldn't we view this kind of therapy, meaning talk therapy, psychoanalysis, the whole related gamut of psychological care, to be a form of medical treatment that is subject to the usual amount of legislative oversight? Well, you may be referring to the NAAP case. And in that particular case, it was a content-neutral regulation that addressed education and training. But that's the cart before the horse. First, we have to figure out if content-neutral even applies by figuring out if this is a First Amendment question or not. And I guess I'm asking that antecedent question of you, which is whether we analyze this as a regulation of medical care and conduct, or whether we analyze it as a First Amendment question. I think you analyze it as a First Amendment question. In fact, the State has actually conceded that it is a content-based analysis. They have essentially not put forth any argument with regards to compelling interest, and they have put no argument forth as to the least restrictive means, not any at all. But, counsel, it strikes me you're jumping over Judge Graber's question. And the first question, which really is a pivot point, is whether or not this is speech at all, or whether it's treatment. So let me – maybe I can break it down. What I'm envisioning is a part of a conversation, if you will, that would go on would consist of a client or patient asking a care provider about the – discussing the pros and cons of such a treatment, whether that is a minor or a minor's parent. Do you think that is speech? Yes, I do think it's speech. All right. And it wouldn't be covered by this Senate Bill 1172, would it? Well, it depends upon what the subject matter is. If the subject matter is same-sex sexual attractions, behavior, identity, yes. Oh, wait a minute. Then I wasn't clear. What I'm positing is a conversation about the pros and cons of this type of therapy. In other words, just trying to decide if I should sign my child up for this therapy, is that speech? I think that is speech. And is it your position that it's covered by this Senate bill? I think it is covered by the Senate bill. And I think if you go to Connett. But what part of the statute do you think covers that kind of a conversation? The statute says under no circumstances may any practices be done if the focus is change. And it also says that. So why is a discussion pro and con an effort to change anything other than just a riot the appropriate? In Connett, there was discussions that were permitted pro and con. But when you move from pro and con to saying we want to recommend, then that statute ultimately was applicable. Even here, though, it's not clear whether discussions pro and con are in fact permissible, because it's going to be up to the individual client as to the perception of what kind of counsel he or she is receiving. If there's a statutory ambiguity, then wouldn't the rule of constitutional avoidance require us to construe it in the light that Connett would require? That is to say, that it's perfectly okay to discuss the pros and cons or make a recommendation that is short of actually doing this treatment that's necessary? Not under this scenario, Your Honor, because this is breathtakingly broad. This says under no circumstances, no conceivable situation. But that's not the ambiguity. The ambiguity is what is a change effort, and if a discussion of the pros and cons might or might not be, why don't we have to view it more narrowly as not prohibiting that? Because if you go back and look at the government's position, they say, well, you might be able to give your personal opinion. So that may be on counseling day one. Then the claim can be made. And then there's a question about whether the therapy is a good idea. If in assuming that that is permissible, counselor now meets the client on day two. And the client now says, I'd like to pursue that kind of counsel. Can you help me how to change? I want to set my priorities in terms of my counseling objectives and align my values with my particular goal. Now, that counselor has to say, I can't do that. If I do, it's unethical behavior. If a licensed mental health care provider in California, I think I would agree with you, can that licensed mental health care provider say, all right, you've made this decision that you want to pursue this, whether that is in keeping with my recommendation or not, I can't deliver that therapy, but you can go down the street and get it from an unlicensed counselor or from a member of the clergy, for example. They can't do that. Cannot? Cannot do that. Why not? Why would they be then violating another ethical code for a licensed counselor who is trained in this area, which really undercuts the government's alleged compelling interest, to say, I can't do it, I'm trained in this area, but I'm going to have to refer you out to some other counselor? We can solve that problem for you. We can just construe the statute as not covering that. Okay? What's the next problem? Well, but the statute, the ethical codes do cover that. And if the ethic and if a counselor refers to the statute as not covering that. As Judge Gerber suggested, we have a doctrine of constitutional avoidance. And let's say we look at the statute and say, yeah, you know, there might be constitutional problems if we, if this happens, and we'll just construe it narrowly. So let's say we do that. Do you have any problems left? Yes, we do, because we have clients right now that are receiving this kind of counseling and they're benefiting from it. And so if this particular law goes into effect, these counselors that are currently counseling clients who are receiving benefit. They can give up their license. They have to give up their license. And that's a strong medicine indeed. And it goes right to the very core of this issue. What raises this issue is the same kind of issue that this Court decided in Conant, where the government said. Well, but you get certain benefits by having a license. And, you know, so we just say, look, we want to give this kind of treatment. That's the kind of business we want to be in. Give up your license. And then you can speak all you want. Your Honor, they should not be required to give up their license to engage in protected speech. Talk therapy is speech. And this Court found that. It's really a fine line. I mean, we do all sorts of things based upon speech. If a doctor, a medical professional, a doctor, says you really ought to have your appendix out, and you go have your appendix out, and it turns out the appendix was healthy, you can sue, which is a state action, and get money. You can probably get the license out. You know, or let's say, you know, there's all sorts of advice that doctors give. And if they're wrong about it, if they do a bad job of it and do something that is below the standard of care, furious consequences follow from it, even though it is just speech. Why can't the legislature here say, look, if you want to be a licensed professional, this is the kind of therapy you're not going to provide with words? Because in that situation, the malpractice is not something that the government is setting a standard. It's a standard of care for that particular profession or procedure. Well, who do you think does set the standard of care? You don't think we're the government? Do you think courts are not the government? There's a ton of cases out there that say that action by a court is state action. But the standard of care in this case, even on the face of the statute, is not no counseling for minors. In fact, the counseling associations who are part of the standard of care in May of 2012 didn't oppose, or actually, they opposed virtually identical language to this. They opposed it because of the law. But why can't the legislature say, look, we've looked into it. We have the State legislation. We think it's harmful. We think it's – it causes harm to minors. Minors can't protect themselves. In many ways, they may think they want something or they may be willing to say they want something, but we know that many of – many minors or most minors, depending on age, perhaps all minors of a certain age, are really under the control of their parents, and we as legislature are going to protect them from this. Why isn't that legislature's prerogative? Because there's case after case from this Court and from the United States Supreme Court that just merely raising the issue of potential harm is not enough to ultimately restrict free speech rights. These minors have a right to be able to receive the counseling that they seek. These minors in this case are benefiting from that particular counsel that they seek. And the State can't just simply throw out harm without having any real evidence of it. In the face of their own evidence, it says that there's no research on this area. What this law will do, will stop forever any potential research, because it will ban it and put it into the area of question. I thought there was anecdotal evidence, at least. No, there was no evidence. The APA – We certainly have. You look at Amica's briefs. No, but not for minors. Not for minors, as it relates to minors, which is what this is about. The APA task force says that there's no evidence. Well, but counsel, if there's – if there's evidence of harm to people who are over the age of 18, why would we assume that that isn't transferable into a finding that there would also be harm to persons under the age of 18? I don't think you can have conjecture. The Brown case at the U.S. Supreme Court. Well, why is that conjecture? Why is that conjecture? Because there is no evidence. It's just mere conjecture. Let me give you another example. There is a California statute, I believe, that prohibits injecting silicone into breast tissue. And let's suppose the legislature had looked only at statistics about women. But there were men who for some reason wanted this. Would that mean that the statute isn't valid because they didn't look at enough evidence? I mean, I guess I don't understand the connection between having to have an exact match on the findings. Well, I think even if you look at the information that's before the – in the record of the SB 1172, as it relates to adults, it says that there's anecdotal evidence of harm, but there's also anecdotal evidence of benefit. It goes both ways. Isn't that what legislatures do every day? They listen to competing lobbyists and constituents and look at evidence on both sides and they make a policy judgment? Isn't that their job? I would submit that it's – they've gone far beyond that here to intrude in protected constitutional liberties of freedom of speech. Just like the Federal Government did in Conant. Just like other – the Vasquez case where the Federal Government did that with regards to what lawyers could counsel. They could only counsel in favor of certain laws, but not against certain laws. In Conant, they could only counsel against marijuana, not for marijuana. Here they can only counsel affirming same-sex sexual attractions, not change, even though the client seeks that particular counsel. The Counseling Associations in May of 2012 specifically went on record saying this was an unprecedented regulation of psychotherapy. And that's part of their brief as a part of that letter that they sent in the amicus brief of the Counseling Associations. They then said that they proposed an informed consent as an alternative. If we look at this, that certainly is a lesser restrictive means. In fact, what triggers this statute? It's the subject matter of same-sex sexual attractions, behavior, or identity. Someone could have – It's not, because – because I go back again to trying to get you to break this down between speech and treatment. And I haven't heard you budge very much. Maybe you're doing your job. But for me, it seems to me that there's a really important distinction, first of all, between talking as a responsible parent about the pros and cons of a particular type of treatment versus having the treatment. That's the first distinction. And we've talked about that already. But there's another distinction, too, about these various types of efforts, of sexual orientation change efforts. And so can we talk about the aversive techniques and – Well, yeah. In terms of the aversive techniques, none of the clients that we represent engage in that. Thank you for that clarification. My question is whether or not your clients are taking the position that that is also speech, those types of efforts. I think, like, tattooing, depending upon whether or not the form of it, it could be. But those are several-decade-old activities or kinds of psychotherapy. So what? So what? Well, it's like trying to ban some kind of medical treatment based upon somebody's attempt to drill holes in people's skull 50 years ago and using that as a basis. You didn't answer, so what? So, I mean, if in fact that is covered, I mean, the fact that people don't practice it, it's still speech, right? It's still speech. Yes. If we say this law is not valid, it could come back. There's nothing to prohibit it. The fact that they happen to have gone out of vogue right now. Well, I think it's speech like tattooing is speech. I mean, the case that talks about tattooing is speech. Well, no. Tattooing is more than speech. It's an activity, yes. But tattooing, though, there's a case from this Court speaking about Anderson case that found tattooing to be pure speech, even though it involved a particular activity. So I'm, again, trying to get an answer to this question about whether your clients break this down, or is it your position that all of it, all of the aversive techniques as well are also speech, or are you just talking about talking therapy? Well, as it relates to the relevance to our clients, they engage in talk therapy. I understand that part. But as it relates to the overall area of kinds of therapy, I think it covers everything. Because where you also – where you move from just simply the introduction of the counselor and client to this general question, to then the next day talking to them and helping them work through whether you're just doing verbal or whether you're doing some other kind of demonstration for them, that's part of their speech. That's part of their communication. So you're essentially agreeing that everything that's said here applies to the aversive theory as well, so that the statue is struck down, is enjoined. Yes. Then if therapists decide, gee, the aversive theory was really good after all, we're going to bring it back, that would also be permitted, right? That would be, I think, the impact, certainly. But I think you have other – I'm not sure I know what that means. That would be an impact. Well, I think you strike down the entire statue. That would be permitted. That would be kind of permitted. It could come back. They could do it. Correct. And I think you already have other – So we can't sort of put that out of reach and say, oh, all the stuff they say about aversive theory doesn't matter because they no longer do it. That just happens to be an accident of history. Well, I think that could be a completely separate – So have you looked at the ex-gay's amicus brief? Yes. Okay. There's evidence right there. There's people who say they've undergone it and sister of one young man who killed himself. And at least in that brief, there seems to be evidence that the stuff is harmful. What would you do with that? I think there's also evidence that it's not harmful, and there's no evidence as it relates to harm reduction. Well, if there's evidence going the other way, then the legislature wins. But I don't think that that amicus brief supports harm to ban all counsel. In 2009, the same legislature said that 12-year-olds can consent to any mental health counseling without their parents' consent. That includes this kind of counseling. What happened between 2009 and 2012? Nothing. There's no change, not a single thing. In 2012, the counseling – Does that make any difference? That legislature – if that were true, the legislature could stop meeting, because things don't change very fast. There are issues that come up of public policy that maybe the issue wasn't raised. I don't understand why it matters that, in general, 12-year-olds can consent. What if the legislature had said instead no electroshock for persons under the age of 18 or something else that relates to mental health? Why can't they carve out some things where they think that people are not mature enough to make that decision? They might be able to carve out specific kinds of things. Well, that's what they've done here. But this doesn't carve out specific kinds of things. This says under no circumstances. Any counsel – I don't understand the distinction you're making. If a 12-year-old can go to a therapist and say, you know, I hate school, I hate my parents, please help, and they can talk. That probably, you know, refers to a lot of 12-year-olds. But they can't get sexual orientation change therapy, and they, in my example, can't get electroshock treatments, and maybe they can't get psychoactive drugs, let's say. Let's say the legislature has made a series of determinations. Why can't they do that, even though the general age of consent is a young one? Because I think it's the same way of saying they can ban video games, violent video games. You can't just simply tell the minor that they can't receive certain kinds of information because of some anecdotal or hypothetical or conjectural harm to the minors. That analysis assumes this is speech, right? That analysis assumes this is speech. But when a counselor counsels, that's the only tool that they have is to speak. It's verbal communication. Well, if we're talking about, again, if we're talking about talking therapy, I might agree with you, but then that harkens back to the earlier conversation we just had about whether the aversive techniques are part of this. And I understood you to say they're part and parcel. Well, I think you could look at certain kinds of activity, but this sweeps everything in together. And it includes talk therapy because it says it's so broad, any kind of counsel, any kind of effort. Now, that could be aversive or non-aversive. Any kind of discussion regarding change, even though the minor and the parents have informed consent and they seek that and it's benefiting, is impermissible and subjects the counselor to discipline and loss of their license. You know, I got the brief wrong. The X case is evidence going the other way. I was talking about the survivors of sexual orientation brief. Yes. You've seen both. Yes. And the X case goes the other way. There's evidence going both ways. And what do we do? You know, I'm not going to just say that. I think we, you know, when there's evidence going both ways, isn't that when we defer? No, Your Honor. Not when it is a content or viewpoint-based restriction. And in this particular case, it is a viewpoint-based restriction because the content of the subject matter raises the effectiveness or the application of this statute. You've got about five minutes left. Do you want to save it? Yes. I'll just say this. That the viewpoint of change is what ultimately is the hammer that comes down on both the counselors and the clients. I'll save the remainder for rebuttal. Thank you. Okay. We'll hear from the other side. Are you splitting time? We are, Your Honor. Okay. May it please the Court, Alexandra Robert Gordon from the Office of the Attorney General for Appalese. I will be taking the first 20 minutes, and then I will be ceding the final 10 minutes to Mr. Minter for the National Center of Lesbian Rights on behalf of Equality California. So I really want to refocus the Court that this is not a breathtaking, SB 1172 is not a breathtaking prohibition on any kind of protected speech or speech at all. It doesn't have to be breathtaking. Even very small prohibitions on speech violate the First Amendment. So it doesn't have to be breathtaking. No. Here's the problem. We have CONAT. This is Walters, right? You remember that case? I do. And we said in CONAT, when it's circuit law, we're bound by it. And I thought it was pretty good, too. I liked it. He particularly liked the concurrence. The concurrence. He liked that a lot. Which side of the maker's bridge? I'm thinking. I find Green Bridge very helpful myself. Who offered that? Oh, that was you. But anyway, so we have CONAT that says that speech advice, getting advice from medical professionals is First Amendment protection, right? And we have the Supreme Court in Brown telling us very recently that if you have something that implicates the First Amendment, you have to have compelling reasons, not just sort of conjectural reasons, not just very common sense reasons. You have to have something pretty compelling. And that was unanimous. And there were two justices who expressed doubts, but it's a pretty strong ruling from the Supreme Court that says even when dealing with children, you've got to have something really compelling. And we don't really have anything compelling here, as I see it. Well, Your Honor. I mean, compelling evidence. I don't mean compelling issue. Obviously, people feel very strongly about this, as people felt very strongly about video games, probably more strongly in this case. But the evidence before the legislature is weak. Actually, Your Honor, I disagree that the evidence before the legislature is weak. So we can start there. Point me to something strong. Let's start there. So first of all, let's talk about the APA report, because that is one of my opposing counsel's favorite things, to criticize and pull out sentences out of context. I think it's important to take a step back and realize that the scope of the APA report was not actually trying to prove harm or prove efficacy. It's a systematic review of every study that's ever been done on sexual orientation change efforts, because it's the proponents of sexual orientation change efforts that should prove it. Remember, you are looking for evidence, strong evidence, supporting the legislative action. So saying it doesn't harm you doesn't – is not good enough. So I've got the report here, and I'm willing to look at chapter and verse, page, language, sentence, that you think is strong evidence. And I've looked. I can't find it on my own. So you go ahead. Help me out. We can certainly do that, Your Honor. But before we do that, I think we have to – Why don't you just do it? Why don't we just do it? Fine. Just do it. All right. So let's look at all of the evidence that the legislature had before it. And it's not just a question of whether this is harmful, because we're calling this unprofessional conduct, which means it falls below the prevailing standard of care. So we have a lot of evidence that it's ineffective, that it's scientifically discredited, that it's based on a notion that homosexuality is a disease that needs to be cured, something that has not been thought to be true since 1973. Every major professional organization to consider it says this isn't therapy, this isn't social work, this isn't psychoanalysis. We think this has substantial risks of harm.  I'm sorry. You are giving us your view. I'd like you to point to evidence. Point to something. Fine, Your Honor. Point to the most compelling thing that the legislature had that supports what it did. Just a thing. Not you talking, but the thing that actually is in the legislative record. Fine, Your Honor. I'm sorry if it sounded like it was me that was talking. I am actually quoting from the legislative findings. I can't see quotes. No, of course. And that would be Section 1C through M are all of the findings of the professional organizations, including a study by Caitlin Ryan. But that's not evidence. That's the legislature speaking. I'm talking about evidence. Well, the legislature. We're looking for compelling evidence. Okay. The legislature can say anything at all, but if we look at what the Supreme Court said in Brown, remember, that's a video game case. That was also a case I know a lot about. And that case was argued in Sacramento, incidentally, in the shadow of the Capitol in our court. So we – and the Supreme Court said it has to be compelling. I can cite a chapter and verse. Would you like me to cite it? No, Your Honor. I'm aware of the citation, but I'm also – Okay. So being aware of the citation, I'm sure you came to court with something in the record, some piece of evidence that was before the legislature that meets that standard, right? Your Honor, what I have cited to you – Just say it. Tell me what it is. Yes. It is all of the legislative findings relying upon the findings of the professional organizations themselves that this is harmful. But the Supreme Court said not findings, but evidence. So go back behind the findings and point me to the one piece of evidence that we could call compelling, saying that this causes harm. Just a piece of evidence. You know, a testimony, a report. There was testimony by victims of – who had gone through sexual orientation change efforts. Also, I believe it's Section 1M is the findings of Caitlin Ryan, who studies children and teenagers who have been forced to go through sexual orientation change efforts and has documented the specific harms that have come to them from this. Counsel, I'd like to, if I may, with the Chief's permission, change the focus a little bit, because the discussion of compelling matters only if this counts as speech. And I'd like you to go back and give your view of to what extent talk therapy constitutes speech and how we treat it for First Amendment purposes, whether as pure speech with the compelling interest required, as something in between where regulation of a profession is dealt with, or just medical treatment, which would be yet a lower standard. Where do we go on that spectrum? So, Your Honor, where we go on that spectrum, I think, is largely dictated by this Court's holding in Mapp, which says that talk therapy, even though it takes place through speaking, does not – it's a treatment. It's not speech for First Amendment purposes, and it doesn't entitle the profession to a higher level of First Amendment scrutiny. Well, it also says the communication that occurs during psychoanalysis is entitled to constitutional protection, but it's not immune from regulation. How much protection should it get? I would say it should get very little protection, Your Honor, where the communication that we're talking about is the treatment itself. There's no meaningful distinction between talk therapy that is treatment and other forms of SOCE, such as lobotomies, electroshock therapy, snapping yourself on the wrist with a rubber band repeatedly. They are all supposedly forms of SOCE treatment, which the State has tremendous power and authority to regulate. Mapp also makes that clear, that simply because – Well, how about if you go to the doctor and the doctor says, you know, I really think you should be running 2 miles a day. Is that treatment or is that speech? Let's say you go out there and run 2 miles a day and drop dead of a heart attack. No, I'm, you know, let's say it's the wrong advice if the judge, if the doctor had been more competent, you know, he wouldn't have given that advice given the condition of the patient. Is that speech or is that treatment? Your Honor, that is speech within medical practice. Why isn't that treatment? When the doctor tells you you should do this, why is that speech and not treatment? I mean, what I'm saying, you're making an argument here and we're going to write an opinion, probably, and that's going to govern everybody's relationship with their professionals, right? So we have to think about situations like that. Anything we say, so you say, oh, well, this is not, this is, this is, this is, this is, you know, therapy is treatment, is treatment. But what else is treatment? What else is it that happens in a doctor's office, a lawyer's office, in a other, you know, professional's office that involves spoken words can be classified as treatment rather than speech? Well, I think this Court has already sort of gotten at that. I mean, in some sense, the fact that it's, so the fact that it's treatment is the first level. And in comment we said, we've said recommending marijuana is speech. Yes. But there was, absolutely. And it was speech as part of confidentiality. And prescribing marijuana is speech. Actually, I think the Court distinguished between prescribing marijuana and recommending marijuana. Prescribing marijuana is treatment for those purposes. And nobody doubted that the government could keep doctors from prescribing marijuana, as long as it had a reasonable basis for doing so. Where you have a problem is you have an insertion, basically, of the government to gag doctors from giving otherwise reliable and competent advice about a treatment where there was, as you said, a lot of legitimate debate about its efficacy. That led to. How do we reconcile Conant, though, with NAAP, or however many A's are in the middle of that? And how do we decide where treatment begins and ends? Is it coextensive with communications that would be privileged as between the caregiver and the client? Or is there some other dividing line that makes it speech? I mean, obviously, the person in the waiting room who greets you and gives you a cup of coffee, that's not going to be treatment. But how do we decide? Well, I mean, how you would decide is between treatment and other sort of communications about treatment when the treatment relies on words. Is that, I mean, is that the dividing line? I mean, in this case, it's somewhat clear because we know that there's a distinction between describing a therapy, recommending a therapy, and actually beginning to engage in the therapy. If you look in the record, which was available to the district court, you'll see descriptions of the therapy. And you'll also see that each plaintiff says that they engage in an elaborate informed consent process where they explain the therapy. Some patients may decide that they'd like a different kind of therapy. They get a referral to someone else. And then there's a point in time where the therapy actually begins. And it's your view that the statute deals only with that latter area where the therapy actually begins? Yes, Your Honor. Well, then under NAAP, is the first part that we're talking about, everything leading up to the start of the therapy, is that speech? That is communication within medical practice. It is also subject to reasonable regulation by the State. Is it entitled to First Amendment protection? It is entitled to some but reduced First Amendment protection. It is not entitled to the same level as, say, if a doctor were out in the town square making a speech, because it takes place within a highly regulated fiduciary relationship. Okay. Then what about the words that start when the talking therapy starts? Is that speech? Is it entitled to any protection at all? What happens then? That is a treatment. And it is entitled to, if, in general, treatments don't really trigger First Amendment analysis. So I really want you to be clear about this. What's the situation? But if they do, it would be rational basis. It would be highly deferential. Is this really the question you're asking is, is this a reasonable regulation by the State, right? The question I'm asking is whether, once the therapy begins, whether that speech what's the State's position about whether that speech, whether it's entitled to any protection? No, Your Honor. Thank you. The State's position is that that is treatment. Thank you. So everything you've argued up to now would apply to adults as well. Yes. So nothing you've said justifies this legislation on the basis that it involves minors. If the legislature tomorrow said, you know, it's, you know, really the dangerous stuff and people ought not to be able to do this regardless of age, same arguments would apply, same result, right? Yes, Your Honor. But the State's interest is particularly strong when we are dealing with minors and minors have particular vulnerabilities. It doesn't matter if it's not speech. It doesn't matter. No. It's treatment, right? Yes. So it doesn't matter how compelling the interests are. It's enough that it's an interest, right? It's a rational basis of view. That is correct. So is there any way to do you have any argument to justify the statute simply because it uses minors, it's limited to minors? Or do we have to sort of approve it or disapprove it regardless of the effect on minors? No, Your Honor. I think the fact that minors are particularly vulnerable to these sorts of treatments and that the State's interest in protecting minors is great. But I just pointed out to you that if we accept your argument that this is not speech, it's therapy, none of that matters. The degree of interest the State might have in protection of minors doesn't matter. It's therapy. They can prohibit malpractice, legal malpractice. They can prohibit lawyers from advising clients to commit crimes, right? Yes. They can do that, even with professional advice. I mean, because it is professional advice, right? They can disbar lawyers for that. And so presumably all the things you've said, everything you've argued would apply if the statute were applicable to adults as well as minors. Yes, they would. So I'm asking, do you have any rationale that would allow us to uphold the statute on a narrower ground that only applies to minors? Or is it all or nothing? I'm sorry? Or is it all or nothing? I don't think it's – I mean, I'm not sure that it's necessary to justify it, but I think it would show, for example, if this Court were to apply a heightened level of scrutiny that the State does have a compelling interest and that it has narrowly tailored it to certain needs. But you don't think we – you don't think a heightened level of scrutiny applies? No. Okay.  If we were applying a heightened level of scrutiny, at most the only level of scrutiny I believe would be appropriate would be intermediate scrutiny. And we would ask whether the government had a substantial and legitimate interest, which it clearly does. We are talking about protecting minors. We would talk about whether or not the restriction is unrelated to some kind of expression. Which it clearly is. I strongly disagree with the idea that talk therapy or any therapy or lobotomizing people is expressive conduct. This Court has held those are treatments. Every court to consider it has held those are treatments. And even though you may have a particular view about something, performing surgery or performing talk therapy is not an expression of those views. And then I would say that, in fact, that the statute is no more broad than it need be to address the legislature's substantial interest. It is limited to minors. That would be my argument, assuming a heightened level of scrutiny applied. The legislature would still be afforded substantial deference in its findings, though, even under that level of scrutiny. Okay. A few other things I wanted to make clear before I yield my time is just to be clear that the State has not conceded any, that this is a content-based regulation. What the State has said is that content-based and viewpoint-based analysis does not apply to a regulation of a mental health treatment. It's simply inapplicable. But it doesn't apply to all aversion or all talk therapy. I mean, you can, if you go to your psychologist, I don't know the class, what do you call the class of people who give this kind of advice? Psychologists or psychiatrists or mental health professionals? Mental health professionals. Thank you. I knew there was a generic expression. And you say, you know, I am addicted to cigarettes, let's say. Yes. Or I drink too much. Or I'm too fat. I mean, I would like to eat less. And, or I'm anorexic. I mean, you know, there are lots of things that people go through. And they say, well, we're going to talk it out and we're going to sort of search out your problems and try to figure out a way of fixing this problem. Now, that is all not covered. That's perfectly okay. It's only this kind of therapy that's prohibited. Why isn't that a content restriction? Because the reason why it's prohibited is because it's an incompetent, ineffective, scientifically discredited and harmful practice, not because the State is targeting a particular viewpoint or message or that it's shut down an entire content. So it's incorrect to say. But that's just not true, is it? It is true. I mean, the fact that they might have good reasons for not liking this particular content doesn't change the fact that it's content, content-based, right? Well, there's content-based and then there's content discrimination within the meaning of the First Amendment. The State gets to make judgments about what is a valid practice. And, sure, there's content to that. The State is saying, we agree with these professional organizations that this is an incompetent practice. And we're shutting it down because of the harm of that practice, not because we particularly care about your messages or viewpoints of the individual providers, but because this practice is bad. It falls below the standard of care. And when we give you the privilege of a license, we have a right to say that you should exercise the appropriate level of care. Sotomayor, how is that different from the findings as to video games? How is it different from the findings? Yeah. How is that different from the findings as to video games? They had studies and they said, oh, we've got a study that says these things, having children doing these things is harmful to them. Right. So, first of all, the video games. Okay. The video, I know they did. The video game case, though, the government conceded that video games are pure speech. And so we were looking at evidence in a different way. You're not going to make that mistake again. Okay. It wasn't me. It was not me. I don't mean you personally, but it was your office and your, I remember the arguments. I know that. All right. So, before I, oh, I wish. Before I yield the floor, that was pure speech and that was the government relying on particular studies. This is not pure speech. This is professional conduct that takes place through speaking. And what the government is relying on is the experts themselves. They're relying on. And what makes it professional is it involves people who have a license from the State. Yes, Your Honor, in a fiduciary relationship with a client. That's what we have. We have speech within that relationship and within relationships with lawyers and all kinds of other regulated professions are highly regulated. I cannot be told that I can't get up here and make all reasonable arguments, right, and I can't make arguments that are critical of the welfare laws. But I can't make. The Internet, for example. Right. I can't make frivolous. I can't make frivolous arguments, right. If I'm up here talking about how the, you know, the Third Amendment means that I win this case, I can be sanctioned. And no one thinks that that raises a. I've been waiting for a good Southern woman case. And no, I'll see what I can do. No one would suggest that the First Amendment would be violated. I will yield the rest of my time. Thank you. You'd better let our co-counsel. May it please the Court. Shannon Minter appearing on behalf of Intervenor Defendant Equality California. I would just pick up on where the State left off to say that the Brown case did involve a direct restriction on speech, what the Court found to be fully protected pure speech. And the relevant body of case law here is the district court in this case, you know, rightly held as looking at regulations of medical practice. But doesn't the Brown case tell us pretty strongly that we shouldn't be shy about looking at the evidentiary underpinnings of the legislature's findings? And I think that's what the Chief is getting at. What's the strongest evidentiary support for the legislature's findings? Well, as the district court held, the legislature here was relying on, you know, no small quantum of information. It was the collective, very clear consensus of all of the nation's leading medical and mental health organizations who themselves are experts on what's at issue here, which is what constitutes a mental illness or disorder. Right. Counsel, but I think what we're getting at earlier, and I mean no disrespect by that, but I'm going to paraphrase it given our time constraints, is what the legislature seemed to me to have is a bunch of opinions by very learned people in this particular field. So let's just categorize that for purposes of this argument as a lot of opinion. And what I'm asking about is what's the evidentiary support, the research, the strongest underpinnings for any of those reports that the legislature considered? The APA task force, which was a comprehensive review of all of the published scientific literature on the effectiveness or lack thereof of sexual orientation change efforts and on its potential to cause serious harms. That's where we should look. That was the single strongest piece of evidence that did have also the opinions of all of the other organizations. But I would also stress that it would be unprecedented to apply the same level of scrutiny to a regulation of medical practice as was applied to a regulation of pure speech in the Brown violent video game case. Well, that leads me to my other question that I've asked your co-counsel. We have the NAAP case, which, of course, you're very familiar with, and it makes clear, at least it states, the communication that occurs during psychoanalysis is entitled to constitutional protection sum. How much should it get and when does it start? When does it attach? And the rest of that says it's not immune from regulation. The rule that we would like this Court to adopt is that the State can reasonably regulate the practice of medicine, including therapy, including talk therapy, and that First Amendment concerns and the attendant need to apply some heightened level of First Amendment scrutiny only arise as conant held when the State is trying to interfere with the communication of truthful information between the patient and the doctor. That, I think, is the protected aspect of treatment. So that sounds like you're taking the same position, which is that the conversation about the pros and cons of whether to engage in this type of therapy is speech, on your scorecard, yes, and that it's protected? What's critical is not whether it's speech or treatment, but whether it is accurate whether the State is trying to interfere with the communication of accurate, truthful information. Now, in this case, the statute itself, I think, is clear that it applies only to when you begin a course of treatment. It doesn't apply to recommendations. But what's constitutionally significant is not necessarily that line, but whether the regulation the State is trying to do something to interfere with a Where does the speech start, counsel? Do you mean? Protected speech. Protected speech. Where does it start? Well, what's protected is the communication of truthful, competent medical advice between the therapist and the patient. Any attempt to interfere with that on the part of the State, I think, triggers an elevated level of scrutiny. And the truthfulness and the accuracy and the fact within the bounds of providing competent medical advice, doctor-patient communications, I do believe, are protected. All of it. Yes. And, of course, yes, as long as what's going on there is a flow of truthful information and communication. Including aversive therapy? No. Because that is completely outside the bounds of competent care. I've asked you two or three times now, where does the speech start? And I've heard you say all of this communication that's going on within this relationship is protected. So you're going to have to clarify for me. The State can reasonably regulate medical practice as long as those regulations do not interfere with the communication of truthful information. I mean, that in any context triggers heightened first-amendment scrutiny. So you use a more truthful sort of mantra, but truthful in what, in the sense of saying, you know, if you drop an object, it will fall to the ground? That's a fact. Much of what happens in psychotherapy is really subject to screening opinion. You know, whether psychotherapy works at all is a highly debated subject. I mean, you could put all of psychotherapy out of business, but if you use a standard of truthfulness that's applicable to facts of nature, I mean, it's really more like religion than science, isn't it? Well, the language that was used in the Conant decision, in addition to truthful information, was sound, competent medical advice. And I think that in the realm of psychotherapy, as well as other realms of other medical areas of practice, there are very clear guidelines about what constitutes competent care. And what exactly, again, what is the single item that you point to that says this is not sound, competent medical advice? The unanimous view of every leading medical and mental health organization in the country who have taken, you know, gone to the lengths of issuing formal policy statements, explaining to their members and especially to parents that these practices, I hesitate to call them treatments, these practices are not effective. They're contrary to the modern understanding of sexual orientation, and that they put young people especially at risk of very serious harm. I mean, it's unusual to have such a strong, clear professional consensus, but we do have that in this case. I'll just throw in that one of the reasons that the legislature acted right now is they were responding to a very, you know, real problem. I mean, it's been nearly 40 years now since that medical consensus has emerged, but in that 2009 APA task force report, the report said there has been a, quote, resurgence. It's the word they use of efforts to use psychotherapy to try to change, quote, quote, homosexual feelings and behaviors is from the report. They expressed concern about that, and that that report concluded that it is categorically when it comes to children and adolescents that competent therapists should not be engaging in these practices, and that all the other leading organizations agree. Let's see, my time is up. Kagan. Opposing counsel clarified for me that none of his clients that he represents are continuing to engage in any aversive treatments, but I just wonder, in response to your last comment with this resurgence, are you telling us that there's a resurgence of aversive techniques as well as talking therapy? Just the use of psychotherapy. Thank you for the clarification. Thank you. Okay. Thank you. May it please the Court. What Equality California stated in its brief on page 30 is that this necessarily includes content regulation of speech. Indeed, it does. Neither the State nor the intervener has been able to give a clear definition as to where this line begins or ends. And yet the clients that we represent, and hundreds and thousands of counselors all over this State, are putting their licenses on the line when they can't tell us a bright line where speech begins and where speech ends. And that's the problem with this entire regulation. There is no consensus among the counseling associations because there's no counseling association, no ethical code, and no statute other than SB 1172 that bans changed therapy. Even last year, the California Psychological Association and the Psychiatric Association, the Licensed Marriage and Family Association, and the other counseling entity took a position not to ban this changed therapy, but to simply request the informed consent in the May 2012 letter, which is before this Court as part of their amicus brief. So even at that point, there was no consensus, and there still is no consensus. This is an unprecedented regulation that would have monumental consequences for counselors and medical practitioners. If the criteria is truthful information, you go back to Conant, and you pointed out in the concurrence, Judge Kaczynski, that there was information on both sides of the coin. There were some that said marijuana was fine for medicinals, some that said marijuana was not fine. If truth is the ultimate evaluator, which way do you go in that particular case? Who decides what truth is? And counseling is unlike medical practice in the sense that ---- Well, in Conant, we didn't have a legislative enactment or any findings. This was determination by the Justice Department, I believe, to go after doctors and take away their prescription privileges if they gave certain kind of advice. It's quite different. I mean, here we have a solemn act of the legislature. We do. But you look at the legislature, and as you pointed out, you go back to Brown, and you can't take just simply the State's word. When you were asking the question, what's the strongest piece of evidence, both of them said the APA task force. But neither one could point to anything within the APA task force that would allow this kind of unprecedented, very novel kind of regulation, because it's simply not there. There was evidence of benefit. There's some anecdotal evidence of harm. But there was no research, none, on minors. In fact, the APA task force called for additional research on minors. This will shut that down. It will stop it in its tracks. It will ultimately result in significant harm to the client and patient, the doctor-patient relationship. That's why from common law to the present, we have protected that as sacrosanct with the confidentiality and put laws to protect that. Now what the State is doing to protect that. And what are the limits of that? What are the limits of what parents can authorize for their minor children? Well, I think parents can same-sex parents have therapy to have their children turn away from heterosexuality? I think parents, the presumption is that they're fit. Yeah, sure, and that they're fit. And unless there's some real evidence of harm, like in a blood transfusion case, you either have life or death. And because of that stark reality, you intervene, even though someone has a religious belief to the contrary. But here, there is no compelling evidence of direct, immediate harm to these individual minors. In fact, what the State is doing is telling the minors. And in fact, I think this undercuts any compelling or even legitimate government interest if you analyzed it under content or intermediate scrutiny, telling minors, you can't receive this kind of, and parents, you can't receive this kind of training from someone who's educated, trained in the area. We're going to push you out into the field of quackery. If it's harmful with people who are experienced, it's even more harmful with people who are not. And by not including that, by simply saying we're going to push you out into the unlicensed practice, they've undercut any alleged interest that they now claim, because that interest is simply not there. The harm that will ultimately happen. But can't they say, look, this is the harm we see. We don't have to handle every harm. We don't see any evidence out there with respect to unlicensed people. And when we see that harm, we'll deal with it when it comes along. But right now, there doesn't seem to be a problem. Why can't the legislature take harms as they show up and deal with them? It's completely irrational to say that the harm is coming only from people who are professional, but those who are unprofessional are not having any evidence. It doesn't come from truck drivers either, you know. You know, so they say, look, we see this class of people who are doing this thing. It's harmful. We are not going to ban it. If it shifts to another area, we'll deal with that next. Why isn't that perfectly fine? I see my time is up. May I respond? It's not really. Once there's a question pending, you can be deferential. I just want to make sure I'm deferential. Because there's no evidence of that. Even in the APA task force that the government relies upon, there's no evidence of harm among minors. There's just nothing before this Court. And in fact, the contrary evidence, and why we're here on this preliminary injunction, is that there would be significant harm. And even the district court noted in a footnote, sympathized with the harm that the clients would ultimately receive, but didn't address the issue because the court found that there was no First Amendment issue and never got to the irreparable harm. The irreparable harm for our clients would be that tomorrow, if this Court were to decide the other way, they would not be able to get the counsel that actually has benefited them, that has helped their self-esteem and their relationships. That harm clearly outweighs the harm to the State. And we request this Court to enter an injunction. Thank you. Thank you.
judges: Kozinski, Graber, Christen